UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Gabriel W. Despres, | ) | CASE NO. 1:15 CV 410 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| Vs. | ) | |
| | ) | |
| Bernardo F. Moreno, et al., | ) | **Memorandum of Opinion and Order** |
| | ) | |
| Defendant. | ) | |

**INTRODUCTION**

This matter is before the Court upon Plaintiff Gabriel Despres' Motion for Leave to File the First Amended Complaint (Doc. 120) and Plaintiff Gabriel W. Despres's Motion (I) for Leave to Further Amend the Complaint to Add Allegations Concerning the Recent Sale of Dealerships and (II) to Compel Discovery Concerning the Same (Doc. 131). Also pending is the Motion to Exclude Testimony of Anthony J. Iezzi (Doc. 125). This case arises out of plaintiff's employment with defendant. For the reasons that follow, the motions for leave to amend are GRANTED in PART and DENIED in part. Plaintiff's motions are GRANTED to the extent plaintiff seeks leave to amend the complaint to include allegations of damages stemming from

1

the sale of various dealerships. Plaintiff's motions are further GRANTED to the extent plaintiff seeks to conform the amended pleading to the Court's previous rulings. The request for leave to amend regarding the "guarantee," however, is DENIED. As set forth herein, the Court will address plaintiff's motion to compel, to the extent necessary, upon the filing of a supplemental motion after the summary judgment motion is fully briefed and the Court rules thereon. The motion to exclude is GRANTED. Plaintiff's request for a hearing is DENIED.

**FACTS**

Plaintiff, Gabriel W. Despres, brings this action against defendants, Bernardo F. Moreno ("Moreno"), Bernie Moreno Companies, and seventeen incorporated entities identified as "M1 Motors, Inc." through "M17 Motors, Inc." This dispute arises as a result of plaintiff's former employment association with defendants.

On April 13, 2005, Moreno and M1 Motors, Inc. on the one hand, and plaintiff on the other, entered into a signed compensation plan ("Agreement"). Among other things, the Agreement provides plaintiff with an annual incentive in the amount of "10% of Dealership net profit before taxes, but after owner's salary (capped at $300,000 during 2005 and $500,000 in 2006 and beyond)("Annual Incentive"). " Plaintiff moved to Ohio in early May and began working at the dealership. Plaintiff had significant involvement in the operation of the dealership. According to the original complaint, at the end of 2005, the dealership reported a net profit of approximately $500,000. In early 2006, plaintiff asked Moreno when he would receive his Annual Incentive. In response, Moreno proposed that plaintiff reinvest the approximately $50,000 in the business. In exchange for the $50,000 reinvestment, as well as the reinvestment of all future annual incentive payments, Moreno offered to pay plaintiff a "10%

2

share of the profits from any and all dealerships upon their sale ("Amendment")."  Plaintiff orally agreed and thereafter invested his annual incentive for the years 2005-2013.

In addition to the foregoing, the complaint cites a portion of the Agreement that provides for a guarantee.  That provision provides that M1 Motors will provide a guarantee ("Guarantee") of plaintiff's income in the amount of "$16,500 monthly and $55,000 at year end for calendar year 2005."  Even a cursory review of the complaint, however, demonstrates that plaintiff alleges that the consideration supporting the Amendment consists of the Annual Incentive, not the Guarantee.  By way of example, in citing the Agreement, the Annual Incentive provision in the Agreement is highlighted in the complaint and the Guarantee is not.  Plaintiff further alleges:

> 56.  Shortly after the year-end, in January of 2006, in the Mercedes Dealership, Mr. Despres asked Moreno when he would be receiving his **annual incentive payment**, which amounted to approximately $50,000 (**i.e., 10% of the annual net profit after owner's salary**) according to the April 13, 2005 Agreement. See Exhibit A.
>
> 57.  In response, Moreno proposed an amendment to the April 13, 2005 Agreement whereby Mr. Despres would effectively invest the money he had earned in the business in order to facilitate the expansion of the company into multiple dealerships ("the Amendment"). Moreno said to Mr. Despres, "trust me, we can put the money into a new dealership, and we will both make even more money when we sell."
>
> 58.  Moreno promised Mr. Despres that if he left his **annual incentive payments** in the business going forward, then he would be entitled to a corresponding 10% share of the profits from any and all dealerships upon their sale. Moreno repeated, as he had said from the beginning of the venture, that the plan would be to ultimately sell the dealerships for a significant profit. With complete trust in his friend, Mr. Despres agreed to Moreno's proposal.
>
> 59.  In reliance upon the Amendment, Mr. Despres invested his **contracted 10% annual incentive payments** in the business at the end of 2005 and for the years following: 2006 through 2013. Those payments ultimately amounted to millions of dollars in earned compensation which Mr. Despres did not take because of his reliance upon Moreno's promise and the Amendment.

(Emphasis added). *See also*, Compl. at ¶¶ 105, 114.

3

In addition, in the context of the specific claims, plaintiff continually alleged that the "foregoing" of the *10% annual incentive payments* formed the basis for the claims:

> 105.  (In connection with fraudulent inducement claim) Absent the representations made by Moreno, Mr. Despres would not have foregone the **annual incentive payments** to which he was entitled, **which would have represented 10% of the net profits** of M1 Motors, Inc., and all subsequently acquired dealerships.
>
> 114. (In connection with negligent misrepresentation claim) Absent the representations made by Moreno, Mr. Despres would not have foregone the **annual incentive payments** to which he was entitled, **which would have represented 10% of the net profits** of M1 Motors, Inc., and all subsequently acquired dealerships, for the years 2005 through his resignation in 2013. In fact, Moreno intended for Mr. Despres to rely upon the representation.
>
> 123(b). (In connection with the declaratory judgment claim)  In January of 2006, Moreno and Mr. Despres entered into the Amendment thereby agreeing that **Mr. Despres would invest the 10% annual net profits** to which he was entitled back into the business for the purposes of acquiring additional dealerships in exchange for which he would be entitled to 10% of the net proceeds of the sale of any dealership;
>
> 125.  (In connection with promissory estoppel claim)  As set forth and specified above, Moreno, on behalf of himself and M1, made firm and specific promises to Mr. Despres about his **entitlement to certain profits** from the business.

*See also*, Compl. ¶¶ 129-132, 134 (allegations supporting breach of contract claim very clearly based on plaintiff's foregoing of his right to "10% of the profits before taxes and after Moreno's salary as capped in the agreement").

Defendants moved to dismiss the complaint.  The Court granted the motion as to the fraud, negligent misrepresentation, and unjust enrichment claims.  The Court further held that the declaratory judgment claim does not state a claim to the extent plaintiff seeks a declaration that the Annual Incentive entitles him to 10% of the net profits of all dealerships.

During discovery, plaintiff sought information regarding the "past, pending or future acquisitions or purchases of any of the dealerships."  The Court denied plaintiff discovery

regarding this information because plaintiff did not allege in the complaint that any dealership was sold. In addition, during discovery, a dispute arose as to the authenticity of the Agreement. Defendant Moreno appears to dispute that the signature on the Agreement is his. In response, plaintiff retained Dr. Anthony J. Iezzi to opine regarding the validity of the signature.

Plaintiff, *via* two motions for leave, seeks to amend the complaint on three bases. Defendants oppose the motions. In addition, defendants move to exclude any testimony from Dr. Iezzi and plaintiff opposes that motion.

A. Motion for leave to amend

Consideration of a motion to amend filed after the deadline set in the Court's scheduling order entails a two step process under Rules 16(b)(4) and 15(a). *Leary v. Daeschner*, 349 F.3d 888, 906 (6th Cir. 2003). Under Rule 16(b)(4), a "schedule may be modified only for good cause and with the judge's consent." Only after the movant shows good cause may the Court consider whether to grant leave under Rule 15(a)'s directive that "leave shall be freely given when justice so requires." *Cooke v. AT&T Corp.*, 2007 U.S. Dist. LEXIS 4325, *3 (S.D. Ohio Jan. 22, 2007); *Kaylor v. Raddle*, 2005 U.S. Dist. LEXIS 1523, *6, 9 (N.D. Ohio Feb. 3, 2005).

The primary factor under Rule 16(b)'s "good cause" standard is the movant's diligence in meeting the deadlines set by the scheduling order. *Andretti v. Borla Performance Indus.*, 426 F.3d 824, 830 (6th Cir. 2005); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 625 (6th Cir. 2002). Diligence implies a lack of fault or carelessness on the part of the moving party. *Cooke*, 2007 U.S. Dist. LEXIS 4325, *6-7. "[T]he determination of the potential prejudice to the nonmovant also is required when a district court decides whether or not to amend a scheduling order." *Leary*, 349 F.3d at 909.

5

Once Rule 16(b) is satisfied, the Court moves to Rule 15(a).  Despite the "freely given" language of Rule 15(a), the Court is to measure a motion to amend against certain well-settled standards.  Factors to consider include undue delay, bad faith or dilatory motive of the movant, prejudice, futility, and the repeated failure to cure deficiencies by previous amendments. *Checuti v. Conrail*, 291 F. Supp. 2d 664, 667 (N.D. Ohio 2003); *Gen. Elec. Co. v. Advance Stores Co.*, 285 F. Supp. 2d 1046, 1048 (N.D. Ohio 2003).  Although delay alone is not a sufficient reason to deny a motion to amend, "the longer the unexplained delay, the less prejudice the adverse party will be required to show to defeat the motion." *Advance*, 285 F. Supp. 2d at 1048.

1. Leave to "conform to the evidence"

Here, plaintiff argues that he should be allowed to amend the complaint to conform the factual allegations to the evidence, including an expansion of the allegations concerning the written agreement between the parties.  In essence, plaintiff seeks to add allegations that not only did the Amendment require plaintiff to forego the Annual Incentive, it further required that plaintiff forego the Guarantee.

The Court strongly disagrees that these allegations either "conform to the evidence" or "expand the allegations concerning" the Agreement.  Rather, the Court agrees with defendants that plaintiff's new allegations constitute an attempt to entirely change the theory of his case.  Throughout the complaint, plaintiff very clearly alleges that after the parties entered into the Agreement, plaintiff agreed to forego his right to "annual incentive payment, which amounted to approximately $50,000 *(i.e.*, 10% of the annual net profit after owner's salary) according to the April 13, 2005 Agreement" in exchange for a "10% share of the profits from any and all

dealerships upon their sale." These allegations are at the very heart of all of plaintiff's claims. Plaintiff now asks the Court to amend the complaint to include an additional term to the Amendment, *i.e,* that plaintiff actually agreed to forego the right to receive his year-end Guarantee payment, which plaintiff claims is fixed at $55,000.[1]

Plaintiff, however, offers no explanation for his failure to seek leave within this Court's scheduling Order. In that Order, the Court set a pleading amendment deadline of February 4, 2016. In addition, the Court set a fact discovery cutoff of June 1, 2016, and later extended that date to July 1, 2016, for purposes of completing fact depositions only. Plaintiff makes no explanation whatsoever regarding his failure to seek leave prior to the expiration of the February pleading amendment deadline or even the expiration of the discovery cutoff. Rather, plaintiff waited until September 12th–over seven months after the pleading amendment deadline–to seek leave. Because plaintiff wholly fails to offer any explanation for his failure to seek leave, the Court finds that plaintiff does not satisfy Rule 16(b)'s "good cause" requirement. Regardless, even if plaintiff had offered some explanation, the Court seriously doubts whether plaintiff could satisfy that requirement. Here, the allegations plaintiff seeks to add were entirely within plaintiff's control from the very beginning of this case. Surely plaintiff knew what he gave up in entering into the Amendment.

The Court further finds that defendants would suffer prejudice if the Court allowed the amendment. Discovery is over. Plaintiff filed the instant motion just shortly before the dispositive motion cutoff. Pursuant to the Court's scheduling Order, defendants were required to

---

[1] According to defendants, this amendment is necessary because plaintiff now admits that M1 did not have a net profit in 2005.

7

file their summary judgment motion prior to the completion of the briefing on the motions for leave to amend.  The parties and the Court have proceeded in this matter for over a year and a half based on the theory espoused in the complaint.  The theory plaintiff now seeks to add to the complaint was known to plaintiff at the time plaintiff filed his original complaint.  In fact, plaintiff acknowledges that he referenced the Guarantee provision in the original complaint.  As set forth above, however, the factual allegations make very clear that plaintiff bases his claims on the Annual Incentive, which plaintiff expressly defines in Paragraph 56 of the Complaint.  Here, defendants claim that the undisputed evidence shows that M1 did not make a profit in 2005.  Therefore, according to defendants, they will suffer prejudice because they have valid defenses to plaintiff's claims regarding the enforceability of the Amendment.  Defendants claim that plaintiff's true intent in seeking leave to amend is to revitalize his claims under a new theory.  In all, the Court agrees that defendants will suffer prejudice.  To allow plaintiff to assert a new theory at this late date would require the Court to wholly reopen discovery.  Defendants would then be required to redraft their summary judgment motion surely at significant expense.  This is especially so in that all of the information necessary to assert the "facts," as well as the "expansion of the allegations," was available to plaintiff on the date plaintiff filed this lawsuit.  Because the Court finds that plaintiff fails to establish "good cause" under Rule 16(b)(4), the Court need not address Rule 15.  The Court notes, however, that the same factors, *i.e.*, lack of "good cause" for delay and prejudice to defendants, would weigh against granting leave under Rule 15.

     For these reasons, the Court denies plaintiff's request to amend the complaint in order to conform the allegations to the evidence and to expand the allegations regarding the Agreement.

2. Newly discovered evidence

Next plaintiff argues that the Court should allow him to amend the complaint in order to assert a claim for damages resulting from defendants' sale of various car dealerships. Plaintiff filed two motions related to this issue. The first motion, *i.e.*, Doc. 120, requests leave to insert allegations regarding the sale of a Kia dealership. The second motion, *i.e.*, Doc. 131, requests leave to insert allegations regarding the recent sale of other car dealerships owned by defendants. According to plaintiff, the Court previously denied him the ability to obtain discovery regarding whether any dealership has been sold. Plaintiff argues that he just recently learned of the sale of the various dealerships and could not have learned of this information earlier. In response, defendants argue that plaintiff's own testimony indicates that, to the extent the parties agreed to the Amendment, the agreement involved only the sale of the dealership at which plaintiff worked at the time, *i.e.*, the Mercedes Benz dealership. As that dealership has not been sold, any amendment extending to the sale of other dealerships would be futile. Plaintiff disputes the characterization and meaning of his testimony.

Upon review, the Court finds that plaintiff's request is well-taken. Defendants do not dispute that plaintiff only recently learned of the sale of various dealerships. The Court previously noted in the course of the discovery dispute that plaintiff could not assert a claim regarding the sale of the dealership unless he had a good faith basis for believing that a sale occurred. The Court finds that plaintiff satisfies Rule 16(b)'s "good cause" requirement because plaintiff could not have properly alleged a claim regarding the sale of any dealership before the deadline expired. In addition, the Court finds that an amendment would not be futile. Although defendants argue that plaintiff's testimony conclusively establishes that the parties only intended

9

the Amendment to cover the Mercedes Benz dealership, plaintiff disputes this characterization. Because defendants' arguments essentially relate to the facts underlying the claim and not the allegations themselves, the Court finds that defendants' arguments are more appropriately addressed at the summary judgment stage. This is especially so in that defendants' summary judgment motion has already been filed.[2] The Court is careful to note that it is *not opining* at this time regarding the merits of defendants' argument. The Court simply finds that the *allegations* regarding the sale of the dealerships are not futile.

Having concluded that plaintiff satisfies Rule 16(b)(4), the Court also finds that leave to amend is proper under Rule 15(a). The Court finds that there has been no undue delay or bad faith in seeking this amendment. Nor is the amendment futile. In addition, as set forth above, the Court finds that any prejudice to defendants is minimal at best in that the Court will rule expeditiously on defendants' pending motion for summary judgment. Moreover, as set forth below, the Court will delay requiring defendants' response to plaintiff's discovery requests until after the summary judgment ruling is issued.

Plaintiff also requests that the Court reopen discovery for the very limited purpose of compelling defendants to respond to Document Request No. 21, in which plaintiff seeks "All documents concerning any agreements, proposals or understandings entered into by you to sell

---

[2] The Court notes that it is not rejecting defendants' argument that it is possible that sworn testimony could be a sufficient basis on which to deny a motion for leave to amend. For purposes of this case, the Court will address this issue at the summary judgment stage in that the motion is already pending in any event. Because defendants already moved on this issue, the Court finds that defendants will suffer little if any prejudice as a result of this amendment.

10

or otherwise transfer any interest in any automobile dealership." Defendants, although strenuously objecting to the motion for leave to amend, do not lodge any objection to the document request itself. The Court notes, however, that defendants have sought summary judgment on the issue of whether the "promise" made by defendants in the Amendment covers the sale of the all future dealerships, or just the dealership in existence at the time. Because defendants' argument in no way relates to discovery concerning the sale of dealerships, but rather addresses the meaning of the Amendment, the Court will defer ruling on plaintiff's request for documents pertaining to the sale of dealerships until the Court has ruled on the pending summary judgment motion. To the extent the claim survives summary judgment, the Court will address whether plaintiff is entitled to such discovery upon further motion by plaintiff.

3.  Leave to "conform" to the Court's prior dismissal Order

In that the Court has granted plaintiff's request for leave to amend the pleadings regarding the sale of dealerships, the Court further grants plaintiff's request to conform the amended pleading to comport with the Court's prior dismissal Order.

B.  Motion to exclude plaintiff's expert

During discovery, it became apparent that defendant Moreno disputes that he signed the Agreement. As such, plaintiff retained Dr. Anthony J. Iezzi in support of his position that the signature on the Agreement belongs to Moreno. Defendants now move to exclude the testimony of Dr. Iezzi. According to defendants, Dr. Iezzi is not qualified to testify as an expert. Defendants also argue that Dr. Iezzi's methodology is not the subject of peer review. More problematic, according to defendants, is that Dr. Iezzi's opinion is contrary to law. In response, plaintiff argues that Dr. Iezzi is qualified, his methodology is sound, and his opinion is

11

admissible. Defendants further request an oral hearing to allow the Court to question Dr. Iezzi regarding his qualifications and opinions.

The admissibility of expert testimony is governed by Fed. R. Evid. 702, which provides,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579, 597, 113 S.Ct. 2786 (1993), the trial judge serves as a "gatekeeper" to determine whether an expert's testimony is reliable and relevant. "The trial judge has considerable leeway in deciding how to go about determining whether particular expert testimony is reliable." *U.S. v. Sanders*, 59 Fed.Appx. 765, 767 (6th Cir. March 7, 2003)(citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167)).

The Sixth Circuit has noted,

> *Daubert* set forth a non-exclusive checklist for trial courts to use in assessing the reliability of scientific expert testimony. Fed.R.Evid. 702 (advisory notes). The specific factors explicated by the *Daubert* court are (1) whether the expert's technique or theory can be or has been tested; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community.

*Avery Dennison Corp. v. Four Pillars Enterprise Co.*, 45 Fed.Appx. 479, 483 (6th Cir. Sept. 3, 2002). The *Daubert* factors may be applied by the Court even if the evidence at issue is based on "technical or other specialized knowledge." *See, Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

Defendants argue that Dr. Iezzi is not qualified in the science of handwriting analysis. According to defendants, Dr. Iezzi received a certificate from the International Graphoanalysis Society after taking a correspondence course.  According to defendants, a "graphoanalyst" is "ordinarily not an expert examiner of questioned documents." Rather, "graphoanalysis" involves the study of handwriting to determine personality traits.  Defendants claim that Dr. Iezzi's three-year train-by-mail class, in which he received instruction from an instructor whose qualifications are unknown, is insufficient to render him qualified to offer expert testimony as a forensic document examiner.

In response, plaintiff argues that Dr. Iezzi's background qualifies him as an expert. According to plaintiff, Dr. Iezzi's three-year course work included one year of concentration on "authentic versus forged or simulated handwritings."  He is a Fellow and Diplomat of the American College of Forensic Examiners.  Dr. Iezzi achieved this status based on his extensive work in the field, including serving as a handwriting expert on approximately 250 occasions.  Dr. Iezzi points out that he testified as an expert in handwriting in a case before another Judge in this District.  Plaintiff further notes that he is not offering Dr. Iezzi as a graphoanalyst.  Rather, his opinion is limited to his work as a forensic document examiner.

Although the Court finds it to be a close call, the Court will not strike Dr. Iezzi's testimony based on a lack of qualification.  As noted by plaintiff, Dr. Iezzi took a three-year correspondence course, including one year focusing on distinguishing between authentic and forged signatures.  In addition, Dr. Iezzi is a Fellow and Diplomat of the American College of Forensic Examiners.  Dr. Iezzi achieved this title as a result of his extensive experience as a handwriting analyst, including serving as a handwriting expert in over 250 cases.  Although

defendants understandably take issue with Dr. Iezzi's credentials, the Court finds that the argument goes to the weight and not admissibility of the evidence.  Accordingly, the testimony will not be stricken on that basis.

Defendants next argue that Dr. Iezzi's methodology is not reliable.  Dr. Iezzi describes his methodology as follows:

> Okay.  When I get the material, I spend some time just looking at everything, looking for idiosyncratic strokes or just the general feel of everything.  I spend 15, 20 minutes just looking at everything.
>
> The actual methodology is to ask the following question: Does the questioned signature fit among the variables of the verified exemplars.
>
> So you visually lay out the exemplars.  There are similarities and differences among, let's say, the 27 of number 1.  Then you ask the question: Does the questioned signature fit among those variables.
>
> I use the analogy of a deck of cards.  You throw a card into a deck, shuffle the deck and see if one doesn't fit.  That's the basic methodology, and that's how I do all my cases.

According to defendants, Dr. Iezzi testified that this is "his own" methodology and it has not been the subject of peer review.  Defendants claim that Dr. Iezzi testified that there is no standard way to compare signatures and he does not rely on any published standards in using his methodology.  Defendants also point out that Dr. Iezzi used a magnifying glass instead of a microscope in his analysis.

In response, plaintiff argues that, not surprisingly, Dr. Iezzi's methodology is rooted in the visual comparison of verified exemplars with the questioned signature.  According to plaintiff, Dr. Iezzi's opinion is based on a "careful analysis and measurement of a writer's slant, stroke formation, pattern of kinetic energy and the presence or lack of angles, points, and/or garland connectives, among other factors."  Plaintiff notes that *Daubert*'s reliability factors do

14

not necessarily apply to all experts.  Here, it appears that plaintiff asks the Court to focus upon Dr. Iezzi's knowledge and experience.  Plaintiff asks that the Court permit Dr. Iezzi to testify as to the similarities between Moreno's verified signature and the signature appearing on the Agreement based on Dr. Iezzi's experience and training.

Defendants also argue that exclusion of Dr. Iezzi's testimony is required because his opinion is contrary to law.  Defendants note that Dr. Iezzi improperly applies the burden of proof.  In response, plaintiff argues that Dr. Iezzi is not improperly shifting the burden of proof.  Rather, he simply notes that there is no evidence that Moreno's signature is a simulation or forgery.  Plaintiff further indicates that he is simply using Dr. Iezzi's testimony in response to Moreno's claim that the signature is not his.  According to plaintiff, the Court can limit Dr. Iezzi's testimony to a limited description of his comparison of the signatures.

Upon review, the Court agrees with defendants and finds that Dr. Iezzi's methodology is not reliable and his opinion will not assist the jury or the Court.  Here, Dr. Iezzi testified that his "methodology" involves reviewing the signatures for 15-20 minutes.  He further describes his methodology as akin to placing a card into a deck of cards and "seeing if it fits."  Although plaintiff claims that his methodology involves the  "careful analysis and measurement of a writer's slant, stroke formation, pattern of kinetic energy and the presence or lack of angles, points, and/or garland connectives, among other factors," Dr. Iezzi's testimony does not support that he employed this methodology:

> Q Before the break you were describing your  methodology. Was there anything more to your methodology that you hadn't finished in your description?
>
> A I'd like to answer that question as follows: Basically, this is just fundamental. You compare. You compare verified exemplars with questioned documents. I'm sure every

15

> examiner has his or her own method of how they compare. There's no standard way to compare. So, in my experience, I found the best way to compare is as I explained it to you. To use the example of the deck of cards, to lay them out. But the fundamental question for every document examiner is the following: Does the questioned signature fit among the variables? Every examiner has to ask that question. How they ask that question is unique to the examiner, but that's the essential question that must be asked and answered.
>
> Q Was there anything more to your methodology that you haven't yet described?
>
> A No. I'm satisfied with that.

The Court notes that in Dr. Iezzi's expert reports he indicates, for example, that:

> Signature Two consists of a series of strokes presenting no discernible letters. The strokes are slanted with an E+ score slant severely to the right. Each of the six of these Signature Two formats differ slightly, but they all retain the overall basic pattern of kinetic energy, with sharp angles and points and no garland connectives.

Thus, in reviewing signature two, Dr. Iezzi did describe the characteristics of the signature.  But, notably, he testified as follows:

> Q What is a DE Score Slant?
>
> A You measure slant on, it's like a protractor. There's an actual scale from left over to right. And each point on the scale is given a letter from F minus to E+. And so you actually literally, with a ruler, draw lines. *I didn't here.* But when you're preparing material, you actually draw lines from the baseline to the top. And you put a line on it and see where it fits on the plastic protractor. So it's the designation of a slant.

(Emphasis added).

More problematic, however, is that in comparing the signatures, Dr. Iezzi opined that the same individual signed the documents based on the lack of "compelling evidence" that the signature is a simulation or "forgery."  In his report and supplemental report, Dr. Iezzi opined as follows:

> Answer: To a reasonable degree of professional certainty, the answer must be yes, they are written by the same person. This will be amplified after the Discussion below and in the Conclusion of this Report.

16

> Conclusion to the Question presented above.
>
> A signature is presumptively valid. This is always a rebuttable presumption. It is necessary, however, that compelling evidence must exist to declare a signature to be a simulation. Such evidence must rise at least to the level of the preponderance of the evidence.
>
> In this case, there is no such evidence, let alone evidence that rises to that level of preponderance. *For this reason*, I opine that to a reasonable degree of professional certainty, that the signatures of QDl and QD2 as identified above were written by the same person who wrote the Verified Exemplar samples identified above.

(Expert reports at conclusion)(emphasis added).

At his deposition, Dr. Iezzi testified regarding the basis for his conclusion that the signatures are from the same individual:

> Q Yes. On what do you base that statement?
>
> A Yes. If a signature is presumptively valid, in order to argue that it is invalid, you have to present evidence of a compelling nature to say, "This signature" -- "compelling" means that the evidence is such that you could not argue the opposite.
>
> Q Is it your opinion that Mr. Moreno must present compelling evidence to prove that the signature on Exhibit 5 is not his?
>
>    MS. ZIDAR: Objection.
>
> A The answer is yes to that. He has to provide compelling -- yes. The answer is yes to that.
>
> Q Okay. And the reference [in your report to] "for this reason," that refers to the fact that Mr. Moreno has not produced any compelling evidence that the signature is not his, correct?
>
> A That would be correct to that question.

Now, in connection with this motion, Dr. Iezzi provides his own affidavit in which he avers as follows:

> My use and discussion of the terms "preponderance of evidence" and "compelling evidence" in my report and during my deposition testimony refer to my own

17

>   methodology and not to who has the burden of proof in this matter in a legal sense. Regardless of the burdens of proof the parties may have in this matter, it is still my opinion that the same person who signed the verified exemplars I examined also signed Questionable Documents 1 and 2 as referred to in my June 30 Report and September 6, 2016 Supplemental Report.

The new affidavit submitted by Dr. Iezzi highlights the fact that his methodology and conclusion are not reliable. Dr. Iezzi apparently uses the words "preponderance of the evidence" and "compelling evidence" that are unique to his methodology and are *not* synonymous with the legal meaning of those terms. Yet, Dr. Iezzi expressly based his opinion on these very terms. The Court finds that his reliance on these terms–apparently in a "non burden of proof" sense is confusing and renders his methodology unreliable.[3]

More problematic, however, Dr. Iezzi expressly testified that the meaning of "compelling evidence" as used in his assessment of the signatures meant that he would *presume* the signatures were valid unless Moreno could produce "evidence [] such that you could not argue the opposite." Because Moreno produced "no such evidence, let alone evidence that rises to that level of preponderance," Dr. Iezzi concluded that the signatures were written by the same person. Thus, although Dr. Iezzi avers that he was not improperly applying the burden of proof, his opinion rests entirely on the notion that Moreno must product compelling evidence to disprove that he signed the Agreement.  In essence, his opinion and methodology do in fact rest entirely on his version of the "burden of proof." Of course, Moreno need *not* produce compelling evidence in order to disprove his signature.  As such, the Court finds that Dr. Iezzi's methodology, which imposes upon Moreno the duty to disprove his signature, is unreliable. In

---

[3] As defendants point out, Dr. Iezzi's method has not been peer reviewed.

addition, his opinion, which is based on his faulty methodology, is inadmissible.

Defendants request a hearing on this matter to allow the Court to question Dr. Iezzi. The Court finds, however, that a hearing is not necessary. Notably, the Court did not conclude that Dr. Iezzi is not qualified. Rather, the Court reviewed Dr. Iezzi's reports and his recently submitted affidavit. Based on those materials, the Court finds that Dr. Iezzi's methodology is not reliable and, therefore, his opinion is not admissible as expert testimony. Any further evidence will not aid the Court in its decision. Accordingly, the request for a hearing is denied.

In addition, the Court denies plaintiff's request to admit only that part of Dr. Iezzi's report in which he indicates that he compared the signatures. It is readily apparent from both a reading of the expert reports and the testimony of Dr. Iezzi that his opinion that the signatures are written by the same person is based on Moreno's failure to provide evidence disproving his signature. In his conclusion, Dr. Iezzi expressly opined that the "reason" he can opine to a reasonable degree of professional certainty that the signatures were written by the same person is a result of a lack of evidence disproving the presumption that a signature is valid. Thus, the Court will not separate out Dr. Iezzi's "comparison" from his "opinion," which is expressly based on Moreno's lack of evidence.

### **CONCLUSION**

For the foregoing reasons, Plaintiff Gabriel Despres' Motion for Leave to File the First Amended Complaint (Doc. 120) and Plaintiff Gabriel W. Despres's Motion (I) for Leave to Further Amend the Complaint to Add Allegations Concerning the Recent Sale of Dealerships and (II) to Compel Discovery Concerning the Same (Doc. 131) are GRANTED in PART and DENIED in part. Plaintiff's motions are GRANTED to the extent plaintiff seeks leave to amend

the complaint to include allegations of damages stemming from the sale of various dealerships. Plaintiff's motions are further GRANTED to the extent plaintiff seeks to conform the amended pleading to the Court's previous rulings.  The request for leave to amend regarding the "guarantee," however, is DENIED.  As set forth herein, the Court will address plaintiff's motion to compel, to the extent necessary, upon the filing of a supplemental motion after the summary judgment motion is fully briefed and the Court rules thereon.  The motion to exclude is GRANTED and plaintiff's request for a hearing is DENIED.

      IT IS SO ORDERED.


      /s/ Patricia A. Gaughan  
      PATRICIA A. GAUGHAN  
      United States District Judge

Dated: 11/21/16