UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


| | | |
|---|---|---|
| Gabriel Despres, | ) | CASE NO. 15 CV 410 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| Vs. | ) | |
| | ) | |
| Bernardo Moreno, et al., | ) | Memorandum of Opinion and Order |
| | ) | |
| Defendant. | ) | |


### INTRODUCTION

This matter is before the Court upon Defendants' Motion for Summary Judgment on all Claims (Doc. 135).  This is a breach of contract action.  For the reasons that follow, the motion is GRANTED in PART and DENIED in PART.  Defendants' Motion is GRANTED with respect to plaintiff's claims based on his alleged entitlement to 10% of the net profits/proceeds from the sale of one or more dealerships.  Defendants are further entitled to summary judgment with respect to plaintiff's promissory estoppel claim.  In addition, plaintiff cannot seek recovery for annual incentives for the years 2009 and beyond.  Defendants' motion, however, is DENIED with respect to his claims related to entitlement to annual incentives for the years prior to 2009,

1

as well as his Prompt Payment Act claim related to those payments.

**FACTS**

Plaintiff, Gabriel W. Despres, brings this action against defendants, Bernardo F. Moreno ("Moreno"), Bernie Moreno Companies,  and seventeen incorporated entities identified as "M1 Motors, Inc." through "M17 Motors, Inc."   This dispute arises as a result of plaintiff's former employment association with defendants.

Plaintiff and Moreno originally worked together at a Mercedez-Benz dealership in Boston.  Subsequently, Moreno acquired a Mercedez-Benz dealership in Ohio.  In April of 2005, plaintiff and Moreno discussed the possibility of plaintiff working at the Ohio dealership.  On April 13, 2005, Moreno sent plaintiff the following email, in relevant part:

> I am pleased to offer you the position of Vice President of Sales for Ml Motors, Inc. d/b/a Mercedez-Benz of North Olmsted effective May 1, 2005. You will be responsible for all aspects of the dealership's sales operations and you will report directly to me.
>
> Your compensation plan is as follows:
>
> SALARY:                                      $52,000 annually
>
> MONTLHY (sic) INCENTIVE:            10% of Sales Department Variable Gross Profit. See attached worksheet for expectations based on 2005 Performa analysis.
>
> ANNUAL INCENTIVE:                       10% of Dealership net profit before taxes, but after owner's salary (capped at $300,000 during 2005 and then $500,000 in 2006 and beyond)

Plaintiff became concerned regarding the cost of the move from Boston to Cleveland.  On April 28, 2005, plaintiff sent Moreno an email requesting that plaintiff be permitted to add a weekly draw to the compensation arrangement.  Moreno agreed.  ("First Compensation Plan")

2

On May 13, 2005, plaintiff entered into a purchase agreement to purchase a new home in the Cleveland area.  Plaintiff informed Moreno that plaintiff needed to show the mortgage lender, *i.e.*, Countrywide, that he had a certain amount of money on deposit in his bank account.  Ml loaned plaintiff $35,000.   Plaintiff testified that he repaid any amounts provided to him.  In addition, plaintiff informed Countrywide that he leased his Boston home.  He provided a rental agreement and a check from the tenant in the amount of $3000.  Plaintiff testified, however, that ultimately he was not able to rent the house.  He does not recall whether he cashed the check.  Plaintiff testified that the proposed tenant was a friend of his.

Shortly thereafter, on May 25, 2005, plaintiff faxed to Countrywide documentation regarding his earnings from the dealership.  The fax consists of a letter on dealership letterhead.  The letter is dated April 13, 2005, and sets forth the terms contained in the April 13th email, but contains the following additional terms:

| | |
|---|---|
| RELOCATION BONUS: | A $35,000 relocation bonus will be paid to cover all moving expenses |
| GUARANTEE | M1 Motors, Inc. will guarantee your income based on the attached proforma, Monthly compensation will be guaranteed at a total of $16,500 monthly and $55,000 at year end for calendar year 2005. |

The letter further confirms that plaintiff is entitled to take a weekly draw against his monthly bonus.  This letter agreement contains signatures purportedly made by both plaintiff and Moreno.  ("Second Compensation Plan")

On May 31, 2005, Moreno prepared a letter to Countrywide, which provides that plaintiff will earn a guaranteed income of $255,000.00 per year.  Plaintiff sent a copy of the letter to Countrywide and closed on his mortgage the following day.  Moreno testified that he prepared

3

the letter to assist plaintiff in securing his mortgage.  The contents of the letter were false and plaintiff does not seek to recover under this "letter."

In 2005, plaintiff was paid consistent with the First Compensation Plan.  In total, plaintiff received $119,516.90.  According to plaintiff, in early 2006, he asked Moreno when he could expect to receive his year end "bonus.[1]"  Regarding the "bonus," plaintiff testified as follows:

Q      So tell me, as best you can recall, how that conversation went.

A      Simple. I said, "When should I be expecting to get my year-end bonus?"

Q      And what happened?

A      He proposed, you know, "Let's just put the money back into the business, and when we sell, we'll all make more money."

Q      Is that it?

A      That was the gist of it, yeah.

Q      Well, I don't want just the gist of it. I want, to the extent of your recollection, exactly what was said.

A      I just told you.

Q      Okay. To the extent of your recollection, that's exactly what was said?

A      Yes.

When asked about changes to his compensation plan, plaintiff testified as follows:

Q      When was the first time it changed?

A      My comp plan?

---

[1]      Around the same time, plaintiff borrowed between $68,000 and $100,000 from M1 to pay off credit card debt.  Plaintiff borrowed money from Moreno or the dealership on a number of occasions. Plaintiff never suggested that he was owed any money.  Rather, plaintiff continued to borrow money instead.

4

Q      Yeah.

A      First time it changed was in January of 2006.

Q      And how did it change in January of 2006?

A      I agreed to forgo my yearly 10 percent bonus in turn for proceeds, net proceeds, at the end when we sold the company.

In addition, plaintiff testified as follows:

Q      Did he ever offer you the opportunity to acquire equity in any dealership?

A      Yes.

Q      When?

A      In 2006, when I gave up my 10 percent yearly bonus, he offered me 10 percent of the dealership's net profits when he sold.

Q      Now, you say 10 percent of the net profits of the dealership. Earlier I asked you what he had said to you, and you said "proceeds from the dealership." You never said 10 percent.

A      Well, that's what it was.

Q.     Well, I asked you if you had exhausted your recollection of that conversation, you said "yes." And you never said 10 percent.

A      I thought I did. I'm sorry.

Q      So now you're changing your testimony?

A      I'm telling you.

Q      Did you have a chance to talk with your lawyer about your testimony during the break?

A      We talked about it, yes.

Q      Okay. Thank you. That's all I need to know.

Plaintiff's then-wife also testified that Moreno told her that plaintiff would get ten

5

percent

of the profits of the dealerships when they are sold and that she would not be required to work because life would be comfortable.  Plaintiff also points out that at one point Moreno's estate plan, through a revocable trust, included a provision bequeathing a portion of the proceeds from a sale of the dealerships to employees, including plaintiff.

Although plaintiff understood from Moreno that they were "right on track" to hit their target, M1 Motors incurred a loss in 2005.  As such, no incentive payment occurred.  Moreno further testified that no annual incentive was paid for the year 2006 because by that time "he was already making more actually than the money that we had estimated that he would make, so that annual incentive provision would have been removed from his compensation plan."

In January of 2009, the parties executed a new compensation plan.  That plan provides that for an annual income of $104,000 and a monthly incentive of "7% of Sales Department Variable Gross Profit."  The document contains no reference to an annual incentive or effective equity interest and the parties did not discuss these topics.  In 2011, the parties signed a new compensation agreement.  That document provides for an annual salary of $270,000 and a monthly incentive of "15% of total Dealership Net Profit."

The following year, the parties executed a new compensation agreement.  It provided for the same annual salary, but the monthly incentive changed.  According to Moreno, plaintiff worked at the Airport Acura dealership, which had been profitable in 2010 and 2011. Under plaintiff's leadership, however, it began to lose money.  As such, in late May of 2012, plaintiff was offered a revised compensation plan, which reduced his annual salary to $130,000 annually effective July 2, 2012, and included increased monthly incentives.  In June of 2012, Moreno sent

6

an email to plaintiff outlining significant problems that existed with the parties' relationship.  In that email, Moreno gave plaintiff two options.  Option one provided plaintiff with the opportunity to remain employed in Ohio.  It further provided that plaintiff would have to "continue to do well, rebuild your credibility within the organization, and [if so,] we move forward with the grand plans we had seven years ago." Option two provided as follows:

> You move back to Boston with your family and pursue your world of riches there. I am the reason you are here, the reason you have a house in Avon, and will take accountability for that. Therefore, I will sell the Acura dealership and give you $250,000 from the proceeds of the sale of Acura. I will also release you from the $100,000 promissory note you signed. That should cover your negative equity, your moving expenses, and help to put to bed your other financial issues. Of course, this is predicated on you staying on at peak performance until the sale is completed. We part as friends.

At his deposition, Moreno testified that he was being a "schmuck" when he offered plaintiff $350,000 as a "way out" of the parties' relationship.  Plaintiff opted to remain employed in Ohio.

The following year, Moreno offered plaintiff the job of Director of Training.  The parties executed a new compensation plan on May 16, 2013.  Pursuant to that plan, plaintiff earned an annual salary of $130,000 and a signing bonus of $5,000.  The compensation plan also included modest sales bonuses.

In July of 2013, Moreno informed plaintiff that he had to resign or be terminated. Plaintiff opted to resign.  Plaintiff was told that he would be paid $10,000 upon resigning and that the payment was intended to cover "all commissions, vacation etc. We will net out the open items that you have committed to pay and that will be your additional and final comp."  Plaintiff testified that he understood the check to represent "any past commissions due or I guess final check...for...vacation, whatever, things like that."  At no point did plaintiff suggest that he was

owed additional money from defendants.

Ultimately, it appears that plaintiff returned to Boston and this lawsuit followed.  The Court previously granted defendants' motion to dismiss certain claims.   Shortly before defendants moved for summary judgment, plaintiff sought leave to amend the complaint.  The Court granted the motion in part only and permitted plaintiff to add factual allegations regarding the sale of various dealerships.  In addition, the Court permitted plaintiff (as requested) to "remove parties and claims previously dismissed by this Court." (Plaintiff's motion, Doc. 121 p.6).  The Court denied the motion in all other respects on the grounds that good cause for the amendment did not exist and any amendment at this late date would be prejudicial to defendants.

In reviewing the amended complaint, the Court notes that plaintiff purports to reassert entitlement to a monthly incentive with respect to *all* dealerships. (Amnd Compl. ¶¶ 97,104). The Court, however, previously dismissed these claims.  *See*, Doc. 23 at p. 17-18 (dismissing declaratory judgment claim in part because plaintiff did not oppose the argument); Doc. 87 at n.2 (noting that breach of contract claim fails for the same reasons that declaratory judgment claim fails.  In his motion for leave, plaintiff did not seek leave to reassert these claims and, in fact, requested leave to conform the pleading to the Court's previous rulings.  Because at no point did the Court grant plaintiff leave to re-assert entitlement to annual incentive for *all* dealerships, those claims are not currently pending.

The amended complaint contains the following claims, although they appear to be misnumbered.  Count one is a claim for declaratory judgment.  Count two is a claim for promissory estoppel and count three is a breach of contract claim.  Count six asserts a claim for

unjust enrichment and count four asserts a claim for violation of Ohio's Prompt Payment Act.
There is no count five.

Although the amended complaint was filed after the motion for summary judgment, the
Court will treat the motion as applying to the amended complaint. This is so because the only
new allegations the Court permitted plaintiff to assert consist of the sale of dealerships. Because
the Court's Order herein does not depend on these new allegations, the Court will apply the
parties' arguments to the amended complaint.

Defendants purportedly move for summary judgment on all remaining counts.
Defendants' motion, however, makes no reference to plaintiff's promissory estoppel and Prompt
Payment Act claims. Plaintiff opposes the motion.

### STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure, as amended on December 1, 2010,
provides in relevant part that:

> A party may move for summary judgment, identifying each claim or defense—or the part
> of each claim or defense—on which summary judgment is sought. The court shall grant
> summary judgment if the movant shows that there is no genuine dispute as to any
> material fact and the movant is entitled to judgment as a matter of law.

Fed .R.Civ.P. 56(a).

Rule 56(e) provides in relevant part that "[i]f a party fails to properly support an assertion
of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the
court may ... consider the fact undisputed for purposes of the motion ... [and] grant summary
judgment if the motion and supporting materials—including the facts considered
undisputed-show that the movant is entitled to it." Fed.R.Civ.P. 56(e).

Although Congress amended the summary judgment rule, the "standard for granting

9

summary judgment remain unchanged" and the amendment "will not affect continuing development of the decisional law construing and applying" the standard.  See, Fed.R.Civ.P. 56, Committee Notes at 31.

Accordingly, summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its resolution will affect the outcome of the lawsuit."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party.  The court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party.  *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.,* 759 F.2d 557, 562 (6th Cir. 1985).  However, the nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury."  *Cox*, 53 F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d

10

937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Accordingly, "the mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)).  Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment.  *Anderson*, 477 U.S. at 249-50 (citation omitted).

### ANALYSIS

1.  "Effective equity interest" claim (sale of dealerships)

Defendants argue that the 2006 promise of an entitlement to a 10% share in the profit upon the sale of a dealership is too vague and indefinite to be enforceable.  Defendants point out that plaintiff testified that Moreno offered the following: "Let's just put the money back into the business, and when we sell it, we'll all make more money."  As such, he "agreed to forgo [his] yearly bonus in turn for proceeds, net proceeds, at the end when [Moreno] sold the company."  He further testified that the conversation was "extremely brief."  After conferring with counsel during a break, plaintiff testified that Moreno offered him "10 percent of the dealership's net profits when he sold.[2]"  Defendants point out that the parties never discussed when a sale might occur or what would happen if Moreno died before he sold a dealership.  Nor was there a discussion of what would happen if plaintiff quit his job or Moreno gifted the business to a third-

---

[2]        Defendants argue that the Court should not consider this testimony because it occurred after a break in the deposition.  Defendants rely on Local Rule of Civil Procedure 30.1(b)(5).  The Court, however, finds that it need not reach this issue in that the statement relied on by plaintiff is too vague and indefinite to be enforced in any event.

11

party.  Defendants argue that because the parties never agreed how to calculate the amounts due upon the sale of a dealership, the agreement is unenforceable.  According to defendants, plaintiff has been inconsistent in how he himself defines the promise.  Sometimes plaintiff indicate that he is entitled to "proceeds, net proceeds," while he also testified that he is entitled to "net profit." Because the parties never defined the manner in which the calculation would be made, the promise is too vague to be enforced.

In response, plaintiff argues that the promise is sufficiently definite to be enforced. According to plaintiff, defendants simply go through a litany of hypotheticals in an effort to show that the parties did not cover every possibility when they entered into the agreement. Plaintiff claims that the promise is sufficiently definite because, while it may not contain *every* term, it contains the *essential* terms.

"An agreement is enforceable if it encompasses the essential elements of the bargain." *Mr. Mark Corp. V. Rush, Inc.*, 464 N.E.2d 586, 589 (Ohio Ct. App. 1983).  "Omission of less central subjects leaves those matters for later agreement or judicial resolution.  The Court will not create significant additional obligations for either party, nor excuse either party from performance of agreed duties."  *Id*.  On the other hand, "it is well established that a contract is not enforceable when the terms are not sufficiently definite."  *Ta v. Chaundhry*, 2016 WL 3743366 (Ohio Ct. App. July 12, 2016).

> It is not enough that the parties think that they have made a contract.  They must have expressed their intentions in a manner that is capable of being understood.  It is not enough that they have actually agreed, if their expressions, when interpreted in the light of accompanying factors and circumstances, are not such that the court can determine what the terms of that agreement are.  Vagueness of expression, indefiniteness and uncertainty as to any of the essential terms of an agreement, have often been held to prevent the creation of an enforceable contract.

12

*Rulli v. Fan Co.*, 683 N.E.2d 337, 339 (Ohio 1997).

In general, however, "the terms of a contract are sufficiently certain if they provide a reasonable basis for determining the existence of a breach and for giving an appropriate remedy."  "When the parties have agreed about issues critical to the transaction, the courts will determine the meaning of ambiguous terms according to the parties' mutual understanding, the custom and practice in the trade or community, or other established legal principles."  *Mr. Mark,* 464 N.E.2d. at 589.

Upon review, the Court finds that the "promise" is too vague to be enforced.  At his deposition, plaintiff testified that Moreno asked plaintiff to "just put the money back into the business, and when we sell, we'll all make more money."  Counsel specifically asked plaintiff to recall the "exact" conversation and plaintiff responded accordingly.  This promise falls far short of satisfying Ohio's certainty requirement.  Later in the deposition, plaintiff testified that he "agreed to forgo [his] yearly 10 percent bonus in turn for proceeds, net proceeds, at the end when we sold the company.[3]"  This too falls short of establishing certainty because there is absolutely no indication of how much of the "proceeds, net proceeds" plaintiff would be entitled to receive upon the sale of the "company."

After discussing the matter with counsel during the deposition, plaintiff recalled that the

---

[3]     Although plaintiff testified that Moreno "led him to believe" that the dealership was performing well and target, plaintiff expressly testified that he knew in January or February of 2006 that the final reporting for the year showed a loss in 2005.  (Despres Depo. at 127-28).  This testimony further supports the Court's conclusion that no clear and definite promise was made.  It simply illogical that Moreno would offer plaintiff a 10% equity interest in *all* dealerships at a time when Moreno owed plaintiff no money.

promise included a provision that plaintiff receive "10 percent of the dealership's net profits when he sold."  Although a closer call, the Court finds that this too lacks sufficient certainty to create a binding agreement.  As defendants point out, the promise contains no timing element or requirement that defendant even sell the "dealership."  *See, e.g., Callander*, 2008 WL 2026431 at * 6 (concluding that no contract for the transfer of ownership existed in part because the promise contained no "stated time frame for completion."); *See, Ta*, 2016 WL 3743366 at *5 (noting that no time limit or timetable existed for completion of the work).  By way of example, it is not clear whether plaintiff would be entitled to any recovery if defendant died before selling the "business," "company" or "dealership."  In addition, plaintiff himself is uncertain as to what he would be entitled to receive upon a sale if it were to occur.  Plaintiff's own testimony discloses that alternatively the promise entitled him to either "more money," "proceeds," "net proceeds," or "net profits."  When questioned about how his share would be determined, plaintiff testified as follows:

> Q    Now, did you discuss with Mr. Moreno, when you were having this January 2006 discussion, how the net proceeds of the dealerships would be calculated?
>
> A    No. It was an extremely brief conversation.
>
> Q    So when a dealership is sold, you really don't know how you'd calculate the profits, correct?
>
> A    It was the last thing on my mind.

The Court finds that it would have to essentially be required to "create a contract" for the parties in order to determine the existence of a breach and fashion an appropriate remedy.  *Id*. Given plaintiff's own varying testimony and inability to identify what he would be entitled to receive, the Court finds that the "promise" is too indefinite to be enforced.  Nor does plaintiff

14

point to any industry custom or course of dealing that the Court could rely on in assessing the promise.  Accordingly, the Court finds that defendants are entitled to summary judgment on plaintiff's claim for an "equity interest" because the promises to which plaintiff testified are too vague and indefinite to be enforced.[4]

2.  Annual incentives for 2009 and thereafter

Defendants argue that plaintiff is not entitled to annual incentives for the years 2009 and thereafter because the parties' entered into a number of new compensation arrangements, none of which contained a provision for annual incentives.  Defendants further claim that these agreements superseded any prior annual incentive term.  In response, plaintiff argues that the subsequent agreements do not contain a provision for an annual incentive because plaintiff exchanged them in early 2006 for a 10% interest in the sale of the dealership.  In addition, plaintiff argues that there is no indication that the 2009 and subsequent agreements intended to supersede the annual incentive provision contained in the 2005 agreement.

Upon review, the Court finds that defendants are entitled to summary judgment.  Both the First Compensation Plan and the Second Compensation Plan provide that plaintiff is entitled to an annual incentive.  Those documents start off by providing:

> I am pleased to offer you the position of Vice President of Sales for M1 Motors, Inc, d/b/a Mercedes-Benz of North Olmsted effective May 1, 2005. You will be responsible for all aspects of the dealership's sales operations and you will report directly to me.
>
> Your compensation plan is as follows....

---

[4]     Having determined that the agreement fails for indefiniteness, the Court need not address whether the promise applied to all dealerships, as opposed to just the Mercedes-Benz dealership.  Nor is the Court required to reach defendants' argument that the promise is not supported by consideration.

15

In 2009, the compensation agreement similarly provides:

l am pleased to offer you the position of Vice President of Sales for Ml Motors and M2 Motors, Inc. effective January l, 2009. You will be responsible for all aspects of the dealership's sales operations and you will report directly to me.

Your compensation plan is as follows....

It is undisputed that the 2009 and subsequent agreements make no mention of an annual incentive.  Yet, the face of the document expressly provides that the terms contained therein consist of plaintiff's "compensation" plan.  There is no indication that any of the terms from the previous compensation plans carried over to subsequent years or that the parties intended the 2009 plan to outline only part of plaintiff's compensation.  Rather, the express language is to the contrary.  And, although plaintiff argues that he did not include provisions for an annual incentive because he believed he previously exchanged them for a right to 10% of the profits upon the sale of the dealership, plaintiff wholly fails to offer any *evidence* in support of this assertion.  Rather, plaintiff rests on attorney argument alone, which is insufficient to create a question of fact.  Moreover, the Court rejected plaintiff's argument that a binding contract arose whereby plaintiff exchanged his right to annual incentive.  Plaintiff cannot benefit from the failure to execute an enforceable agreement.  In other words, the Court will not read an annual incentive term into the compensation plans for the years 2009 and thereafter.  As such, defendant is entitled to summary judgment with respect to plaintiff's claims for annual incentives for these years.

        3.        Annual incentives for years prior to 2009

Defendants argue that plaintiff's claims for annual incentives for the years prior to 2009 are barred by the statute of limitations.  According to defendants, plaintiff cannot show that an

16

enforceable compensation plan that included annual incentives was ever "in writing."  As such, Ohio's six-year statute of limitations applicable to oral agreements bars plaintiff's claims. Defendants claim that the First Compensation Plan is not a "written agreement," in part because the "draw component" is a material term that was orally added subsequent to the April 13, 2005 email.  Defendants further claim that plaintiff cannot rely on the Second Compensation Plan, which is a signed document, because it was a "sham" document that does not accurately reflect the parties' intent.  Furthermore, Moreno disputes that he signed the document.

In response, plaintiff argues that the Court can consider the Second Compensation Plan even though Moreno denies signing it.  Plaintiff also claims that whether the signed compensation plan was intended to reflect the parties' agreement is a question of fact for the jury.  As an initial matter, the Court notes that defendants acknowledge that although they dispute the document's authenticity, they do not premise their motion for summary judgment on this issue.  Rather, defendants note that "the question is not whether it is authentic, but whether that agreement is a sham."  Accordingly, the Court will consider the existence of the Second Compensation Plan for purposes of addressing defendants' argument.

Upon review, the Court agrees with plaintiff that a question of fact exists as to whether the Second Compensation Plan is a "sham" document.  As a general rule, parol evidence of prior agreements is inadmissible to vary or contradict the terms of written contract that is "the complete and accurate integration of that contract."  *Nat'l City Bank, Akron, v. Donaldson*, 642 N.E.2d 58, 60 (Ohio Ct. App. 1994).  However, the parol evidence rule does not apply when one side argues that the "parties agreed that the document would not be an expression of an agreement between them."  *Id*.  "It is well settled that whatever the formal documentary

17

evidence, the parties to a legal transaction may always show that they understand a purported contract not to bind them; it may, for example, be a joke, or a disguise to deceive others." *Id.* (citations and quotations omitted).

Defendants initially point out that on May 25, 2005, plaintiff sent the Second Compensation Plan to Countrywide in order to obtain a mortgage.[5]  As defendants point out, the Second Compensation Plan contains additional terms that are not set forth in First Compensation Plan.  By way of example, defendants note that the May 25th document contains a relocation bonus, which defendants never paid.  The parties do not dispute that defendants issued plaintiff a $35,000 check.  The face of the check receipt, however, shows that the $35,000 was a loan to be repaid.  In addition, Moreno offers his own affidavit in which he avers that this loan was made to assist plaintiff in demonstrating to his lenders that he had a certain minimum amount of money is his bank account.  Plaintiff himself testified that to the extent he received any money for "moving expenses," he repaid the entire amount.  Nor has plaintiff sought to recover for the relocation bonus in this lawsuit.  These actions are entirely inconsistent with any intention to have entered into the Second Compensation Plan.  They are consistent, however, with a subsequent letter Moreno later drafted to Countrywide, in which he indicated that plaintiff would be paid guaranteed earnings of $255,000.00.  Moreno testified that the statement was not true and that he signed in knowing that plaintiff was submitting the letter to Countrywide.  Again, at no point does plaintiff claim that the parties agreed to a guaranteed income of $255,000.00.

---

[5]        Defendants cite to a number of factors demonstrating that plaintiff had difficulty obtaining a loan, including that plaintiff informed Countrywide that he had a tenant for his Massachusetts home. Along with the lease agreement, plaintiff presented Countrywide with a rent check, although no tenant ever rented the home.

In response to defendants' evidence regarding the "sham" nature of the Second Compensation Plan, plaintiff argues only the following:

> Nor can defendants demonstrate an entitlement to summary judgment by asserting, without any citation to the record, that the April 2005 Compensation [A]greement[6] was never meant to reflect his actual agreement with [plaintiff].  This dispute can only be resolved by a jury evaluating the parties' credibility and weighing whatever other evidence there exists to support defendants' contention....  Mr. Moreno does not explain how, viewing the facts in the light most favorable to [plaintiff], he is entitled to summary judgment on the grounds that the April 2005 Compensation Agreement did not reflect the parties' actual intent.

As an initial matter, contrary to plaintiff's claim, defendants do in fact cite in the argument section to nearly three pages of facts in support of their position.  Some of the citations to the record are disclosed in the argument section,[7] while the remaining record citations are set forth in the statement of facts.  Thus, plaintiff's claim that defendants fail to cite to any record evidence is simply wrong.

Here, although defendants have presented evidence that the Second Compensation Plan is a sham, whether a contract is a "sham" would almost universally present a question of fact. Here, plaintiff relies on a document purportedly signed by both parties.  Although Moreno denies having signed it, the Court finds that issue is one for the jury to resolve.  In addition, plaintiff relies on his own affidavit in which he indicates that the Second Compensation Plan evidences the agreement reached by the parties.  The Court finds that a genuine issue of material fact exists

---

[6]  This reference appears to be to the Second Compensation Agreement.

[7]  By way of example, on page 23 of their brief, defendants cite to plaintiff's deposition testimony in three separate instances in support of their argument regarding the $35,000 bonus.  Other facts contained in the argument section are set forth with supporting citations in the statement of facts.

19

as to whether the Second Compensation Plan sets forth the parties' agreement.

Having so concluded, the Court finds that defendants are not entitled to summary judgment based on Ohio's statute of limitations for oral agreements.

5. Promissory estoppel and Ohio Prompt Payment Act

Although plaintiff correctly notes that defendants did not expressly move on these claims, the Court finds that based on the ruling herein, summary judgment is warranted with respect to plaintiff's promissory estoppel claim. A claim for promissory estoppel requires a "clear and definite promise." Plaintiff's promissory estoppel claim is based on the 2006 promise to pay plaintiff a 10% interest in the sale of the dealerships in exchange for plaintiff's right to a 10% annual incentive. As the Court ruled in connection with plaintiff's contractual claims, defendants are entitled to summary judgment because plaintiff fails to point to a clear and definite, or "certain," promise. For this same reason, plaintiff's promissory estoppel claim fails.

With regard to plaintiff's claim under Ohio's Prompt Payment Act, defendants argue only that, because plaintiff's claim for past due annual incentives fails, so does his statutory claim. Having rejected defendants' argument, the Court finds that summary judgment is not warranted with respect to plaintiff's Prompt Payment Act claim.

4. Accord and satisfaction

Defendants argue that when plaintiff left employment, he was paid $10,000 in settlement of any outstanding claim. Plaintiff disputes this contention. Upon review, the Court agrees with plaintiff that a question of fact exists on this issue. To establish an accord and satisfaction, the parties agree that the following elements must be demonstrated: proper subject matter, competent parties, mutual assent, and consideration. On the one hand, defendants note that plaintiff was

paid an arbitrary amount and that it represented payment for "commissions, vacations, etc." Defendants further point out that the payment was also "netted" to account for monies due from plaintiff.  On the other hand, plaintiff notes that the payment expressly indicated that it was to cover "commission, vacation, etc."  Nowhere is there any indication that the payment was to cover other monies due plaintiff.  Plaintiff further points out that there was no dispute regarding how much "commission or vacation" pay plaintiff was entitled to receive.  The Court finds that summary judgment is not appropriate with respect to defendants' accord and satisfaction argument.  Genuine issues of material fact exist as to whether the parties mutually intended the payment to cover the amounts plaintiff seeks in this lawsuit.

## **CONCLUSION**

For the foregoing reasons, the motion is GRANTED in PART and DENIED in PART. Defendants' Motion is GRANTED with respect to plaintiff's claims based on his alleged entitlement to 10% of the net profits/proceeds from the sale of one or more dealerships. Defendants are further entitled to summary judgment with respect to plaintiff's promissory estoppel claim.  In addition, plaintiff cannot seek recovery for annual incentives for the years 2009 and thereafter.  Defendants' motion, however, is DENIED with respect to his claims related to entitlement to annual incentives for the years prior to 2009, as well as his Prompt Payment Act claim related to those payments.

IT IS SO ORDERED.

 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 1/13/17